Thank you, Your Honor. May it please the Court. My name is David Lundsgaard. I'm from Graham and Dunn on behalf of Plaintiff Appellant Gorlick Distribution Centers LLC. I have a lot of things that I could say, but I would like to reserve two minutes for rebuttal, if I may. That will be my objective. Although it is not perhaps the issue that is closest to my client's heart, the logical first issue here is appellate jurisdiction. It may not be close to your client's heart, but it's close to our heart. No, absolutely. I understand that. I appreciate that, Your Honor. And it is logically the place for us to start here. This was an issue. We briefed it in the merits brief at the Court's request. Allied, I did not take a position with respect to that. So by and large, we stand on the briefing, though I'd like to emphasize a couple of points. And the first is the role of the district court in the proceedings below. This was an issue that was, or our proceeding, was clearly presented to the district court. We weren't trying to proceed without the district court supervision. We presented them with the order of dismissal that was entered or a stipulated order of dismissal. Because there was a stipulation, though, you didn't really have to go to the district court, correct? Under 41A? We may not have have been required to go to the district court, but we did go to the district court. And we asked for the district court's supervision and review of what we were doing. And then ultimately, not only did the district court approve the dismissal, the district court ultimately entered a final judgment recognizing that everything had been resolved. Was that after he signed the stipulation? It was. He signed the stipulation and then later on a final judgment was entered and then that allowed, then we moved forward with the appeal. And the reason that that's significant, we feel that that is significant, is as this court said in James, the court's approval, the district court's approval, is usually sufficient to ensure that everything is kosher. This was not a case like American states where we were sort of running around behind the district court's back and we were, at least as reported, and changing complaints and filing new complaints and dismissing claims. Instead, we were completely above board with the district court throughout. The second point that I would want to emphasize are the reasons why we had proceeded this way. After the district court's partial summary judgment order, we were presented with what we believed were potentially non-economically viable claims to try in themselves, similar to the plaintiff in James. Moreover, we were concerned with the possibility that if our discrimination claims were split and we had to try a few percentage in one trial and a few percentage in another trial, we might be faced with the prospect that we could convince neither jury that there was enough discrimination to have an economic impact on our client, whereas if we tried them together, we could win, so that we would lose simply by the division of our claims. And that was one of the reasons why we proceeded the way we did, and we think that those are similar to the legitimate reasons that this court recognized in James as legitimate for proceeding the way that we did. Could you have asked for a 54B certification? We could have asked for a 54B certification, Your Honor, and it was something that we considered as a practical matter. We looked at the situation. We were on the on the very eve of trial, and we preferred to proceed, to try to proceed with with Allied's approval and cooperation and with the district court's approval and cooperation. If we'd filed a 54B request, Allied may or may not have opposed that. The district court may have handled it one way or the other, and we would have still been on the trial track. So we made the election to to run the risk of simply losing some of our claims in order to make things more efficient. Were they dismissed? Our remaining claims, yes, they were dismissed pursuant to the stipulation. But without prejudice? But without prejudice. That is correct, Your Honor. And I think that that is the that was the key fact that triggered this court's original interest in the jurisdictional issue. But finally, to touch on Your Honor's point, is if the court does dismiss for lack of appellate jurisdiction, we would ask that the court indicate we would have the opportunity to go back to the district court and ask for a 54B certification, similar to as I think the court did in the Dannenberg decision, which was pre-James, but I think is an indication of an appropriate potential process if jurisdiction is not found. In terms of the substantive issues, we have some Sherman Act issues and some Robinson-Patman price discrimination issues. On the Sherman Act, the district court alternatively dismissed on two grounds, statute of limitations and then lack of an agreement. In the interest of time, I'm going to try to touch on those briefly so I can get to the discrimination. With respect to the agreement, the thing that I want to emphasize, and of course we're here on summary judgment where all the inferences are drawn in in favor of my client, the non-moving party, we have a direct evidence. We have a statement by an Allied representative. We also have a statement by a Carsound representative that there was an agreement that Carsound would not be shipping to Gorlick in the Northwest. They would still sell to Gorlick in California and everybody knew that was going to happen and then we had to ship to the Northwest essentially on our own nickel. Allied has no response to the statement by its own representative other than to say that it is hearsay. It's not hearsay. It's a statement by... Well, but let's say there was such an agreement. So what? What? What's wrong with that? Yeah. Why is that it could come anywhere near Sherman One? Well, you know, the next step after you prove the existence of the agreement would be to show that it was an unreasonable restraint of trade. The result being that it increased Gorlick's costs vis-a-vis Allied. And so... But you can carve up territories. Well, you... A manufacturer can have territories. A manufacturer sometimes can have exclusive territories. They're not per se legal and this is one of the things where I think Allied has gone astray. They are subject to the rule of reason. Once upon a time, they were per se illegal. Then the Supreme Court said no, that they will be subject to the rule of... to the rule of reason. And that is still... Doesn't mean you get a trial every time you prove a territory. You got to show something more than that. I don't see what the issue is here. This is just a standard territorial agreement. And, you know, if that were enough, showing... I mean, assuming that in fact there was an agreement and we can skim over that issue for the time being. If that were the case, then all territorial agreements would become subject to a lawsuit for Sherman One violations. Well, you still have to show the rest of the Sherman Act. You still have to show injury to competition and show that it was an unreasonable restraint of trade. And those are the next steps after you show the existence of the agreement. The district court didn't reach any of those issues, in part because Allied didn't raise them on summary judgment and because the district court was already dismissing for lack of an agreement, it didn't need to go there. Significance of the fact that Carsound sold to other distributors in Washington, Oregon area. Well, to us that's significant because it indicates that the agreement in question was targeted. To be perfectly frank with the court, if this was truly an exclusive distributorship, if Carsound had said Allied will be our only distributor in the Northwest, I'm not sure if we would even be here today. But instead what happened was Carsound refused to sell to Gorlick in the Northwest, but sold to others, Allied and others. It was only Gorlick that apparently was excluded. So it is a significant difference. It's not a true... That sounds to me like a Robinson-Patman Act claim, which we could talk about. But I mean, this is essentially a price discrimination claim. You're saying, you know, we other people got it and got it shipped locally. We have to add the price of shipping. So that's a Robinson-Patman Act claim. But how do you make a Sherman Act claim out of that? Well, it is a price... It is a Robinson-Patman Act claim, Your Honor. And that was the the one claim that the district court allowed to go through summary judgment was our Robinson-Patman Act claim based on discriminatory shipping policy. But we also believe it was an agreement between two parties that was directed at Gorlick that had an exclusionary effect on Gorlick. And to be sure, we will still have to have testimony about the impact to competition, but that was not an issue on summary judgment. One thing I would I would emphasize, Your Honor, with respect to those issues is this is not a circumstance, or this is a circumstance where there's the evidence in the record is there really were two players, particularly in the Northwest, Gorlick and Allied. So an agreement targeted at giving a disadvantage to one of them would have a more significant, potentially a more significant, impact on competition than if you simply had, you know, a dozen different distributors and a manufacturer said, we're going to elect one. And there were 11 other distributors in the marketplace. So this gets to an element of our claim that wasn't at issue at summary judgment, but that is how we would intend to prove that. And we had expert testimony indicating that there was a harm to competition under the circumstances of this case. I'd like to touch briefly also on the statute of limitations issue associated with the Sherman Act claim. And to suggest to the court that while the district court dismissed based on Orgel, the David Orgel case, this case is much more similar to the Hennigan case where this court allowed a claim to go forward under the statute of limitations. There, the agreement was to divert customers from a particular shop, and this court recognized that every time those customers were diverted, that was another potential antitrust violation. And so the statute of limitations accrued or began at the time of those diversions. Here, we don't have a pure refusal to deal. This wasn't Carsound saying, we won't deal with you ever again, and then Gorlick simply showing up every year or two saying, please sell, and they say no. This was a situation where they were selling to us, but just selling to us at in a more disadvantageous circumstance, and doing so... Well, but again, that's your Robertson-Pattman Act claim. For Sherman 1, you have to show an agreement, and the agreement was enforced according to... assuming it's... there was an agreement at all, but the agreement was enforced prior to the statute of limitations. And if you take this view position, it means that there's never a statute of limitations for a Sherman Act claim. Well, not necessarily. I mean, if... Well, do you dispute the dates that the agreement... No, we don't dispute the dates. So the agreement took place before... if you start from the time the agreement was entered into, you're outside the statute of limitations, right? Well, not if the performance of the agreement continues through the statute of limitations period. What's that? Did you hear my question? I'm... maybe I misunderstood. If you take the starting date, if you start... if you take the starting date of the agreement as the triggering date, as the final date, then you are outside the statute of limitations. I would agree with that, Your Honor, if you take that as the only date, yes. Yes. So I ask an if question, and you answer, what's wrong with a simple yes? Your Honor, perhaps I misunderstood the question. If you take the triggering date, the date that the agreement was... was... entered into, you're outside the statute of limitations. Yes. Okay. That was easy, wasn't it? Okay. So you have to have some subsequent events, something that happened after the initial agreement was entered, that restarts the statute of limitations. Yes or no? It had better be yes, because you're giving away the rest. It's not the triggering date. If the triggering date is the effective date, then you're out of luck, right? If the date of the original agreement is the triggering date, you're out of luck, yes. So something must have happened after the original triggering date that restarts the statute of limitations. Something... Well, not restart... I will say yes, Your Honor, but I will... I do need to explain two things. There were things that happened after the original date. There was the continuing sale to Gorelick in California, knowing that he was going to be shipping it to Washington pursuant to this particular agreement. I don't understand. You're trying to explain what? Well, I'm... I said there has to have been something that happened after the initial date that re-triggered the statute of limitations. We can talk about what it is in a minute, but I just want to understand. Something would have had to have happened after the initial... I don't think that's correct, Your Honor. Under this Court's authority, if the refusal to deal is not permanent, final, and irrevocable, then the statute of limitations can arise later on. It may not be from that original agreement, but if it's not permanent, final, and irrevocable, and this was not permanent, final, and irrevocable, there doesn't need to be a subsequent event later on within the period. Now, even if you do need a subsequent event, as I was explaining, I think what I think those subsequent events are. And, Your Honor, I do see that I am now down to about a minute and a half that I'd like to reserve for rebuttal. So, I'll sit down and turn the floor over to Mr. Lay. Thank you. May it please the Court, Tim Lay representing Allied Exhaust. On the specific question that Your Honor was just asking, I believe that the Pace decision tells us that when there's an agreement outside the limitations period that there needs to be a new independent and overt act within the limitations period to restart the statute of limitations running. But this wasn't a continual refusal to deal with Gorlick, was it? It was. It was a policy that was implemented. Well, they dealt with him in Northern California. They shipped him in Northern California. What's being challenged?  What's being challenged here, Your Honor, is the refusal to pay for shipping in the Northwest. They're not making a challenge about what was going on in California. But they were constantly dealing with him, correct? Correct. But they were uniformly saying, we don't pay for shipping to Gorlick in the Pacific Northwest. But they wouldn't ship to their facilities in the Northwest. That's correct, Your Honor. Right? Right. They didn't care if the product they shipped to him in Northern California eventually made its way. That's exactly right. As long as Gorlick paid for the shipping costs. That's exactly right. But the agreement that is the supposed subject of a Sherman claim here was an agreement, and I disagree that there was an agreement, and I'll discuss that in a moment, not to pay for shipping by car sound to Gorlick locations in the Pacific Northwest. The testimony was clear, and it's undisputed, that that policy started. So if it was pursuant to an agreement, it was prior to the year 2000. It was enforced consistently during that period of time. Let me ask you this. Why isn't there at least a tribal fact as to the whole statute of limitations issue? I'm sorry, I missed you. Why isn't there at least a tribal issue of fact with respect to the statute of limitations? I don't think. How could it be decided on summary judgment? Well, Your Honor, the issue is undisputed that the policy started prior to 2000, and the course of behavior after 2000 until 2008 when Car Sound settled with Gorlick is undisputed. And what that course of behavior indicates is a consistent refusal to pay with, I think, two different orders that were put into Car Sound's system from Gorlick's Northwest locations, but for which counsel admitted at the oral argument in the trial court, he has no evidence that the shipping occurred. And so, in other words, even if the tests were, as counsel describes it, there needs to be a final and immutable policy that never changed, that plainly was here as the trial court found. What we know from the Aurora case is that the mere receipt of, you know, profits or revenues or the benefits of an agreement that's made outside the statute of limitations is not enough to trigger, is not enough to restart, same is true under the Pace decision, Your Honor. You know, it seems to me you're caught between two posts. You don't admit there was an agreement. That's correct. And so we have this whole question, is there a tribal issue of factors with an agreement? And maybe there is, maybe there isn't, but at least it's disputed that there was an agreement. So how can something that's disputed be something that's also immutable and unchangeable and meet the statute of limitations? This is not a situation where you pull out a contract and say, look here, it's written in black and white on paper, it's, terms are clear, you know, we could breach the contract, but we have to pay damages. So you're disputing there was even an agreement. So I have a hard time reconciling you two positions. Here's why, Your Honor. There was no agreement, but if there was, it was immutable? No, no. There are two different things here that are getting mixed up together that I believe I can answer your question. You mean I'm getting mixed up? No, no. It's a confusing issue. I spent five days getting ready for this, Your Honor, and so. That's why I'm here, if I'm mixed up. Here's the reason. To the extent there is a dispute, it is over the question of whether Carsound's refusal to pay for shipping was a unilateral decision by Carsound, that's what the district court found, or Carsound's refusal to pay for shipping to Gorlick was pursuant to an agreement. That's the dispute. Okay, fair enough. I think that's a good distinction. So I take it your position is there was no agreement, but there was a policy. Correct. That Carsound's had of. Which policy was immutable and unchanging throughout. What do we have on that policy to show us it was immutable and unchanging? Well, there's simply no evidence that shows to the contrary. In other words, what the evidence is in the case is that Mr. Gorlick periodically would say, how come you won't pay for my shipping? And they would say, we don't. That's our policy. That's our rule. That never changed during the entire period of time. And so. Well, let me pose some possibilities, and you tell me why they're not possible. What if it was not really a policy, but they had a rule that they won't pay for shipping because he's just too small. And unless his volume went up, that's not unknown to manufacturers to treat higher volume retailers better than small fry. So maybe the rule was, until you start selling more. How do we know that wasn't the rule? We don't, Your Honor. In other words, that's kind of our main point on that issue, is that they need to show that Allies somehow had knowledge that what it was receiving was illegal. And this kind of blends into the Robinson-Packard side of their claims. But the evidence is, we didn't know what the justification was or the basis for Carsound's refusal to pay for shipping. We knew that it existed, but we had no involvement in its genesis. And that's, you know, so if Carsound decided for reasons independent of its own, unilaterally decided for reasons independent, then that's not a Sherman claim because there's no agreement. And so our main point on the Sherman, we have two points on the Sherman claim. One is, there's no evidence of an agreement. And the only evidence that they have is this stray Carsound, or excuse me, Gorlick employee who reports that an Allied employee told him there was an agreement. That's the only bit that really goes towards proving what the fact of an agreement. What they need to do under the Sherman Act case is to show that on the totality of the record, it's, you know, there was an agreement. And they fail here. And here's why, and they also need to show that the agreement they're positing is reasonable, is rational from an economic standpoint. Here's why we know that's not the case. The record as a whole here shows that what Allied's people were concerned about was that Allied would open up this Pacific Northwest market. They would go to all that trouble and expense, open it up for Carsound, and then Carsound would start selling to another distributor in the Pacific Northwest. That's the concern that Tom Jones, the Allied employee, described. That's the concern that Steve Blanding, the Allied CEO, mentioned in his emails that they talk about. They had a broad concern. They wanted an exclusive distributorship if they were going to go to the trouble of setting up the Northwest market. In that context, it doesn't make any sense that they would be concerned about this narrow issue of does Carsound pay to ship to Gorlick in the Pacific Northwest. That claim, on the Robinson-Packman side here, Mr. Lunsgaard just conceded was an economically non-viable claim. In other words, that claim survived summary judgment, but they decided to dismiss it, voluntarily dismissed it, because it wasn't worth taking it to trial. That's part of the stipulation. And so the agreement they're describing on this narrow issue of shipping doesn't make sense in the context of this relationship, and it doesn't make sense in the context of the totality of the record here. And so we believe that the district court's decision was exactly correct. The second argument on the Sherman Act is the limitations period, and we think that's clearly what the district court was correct here. I'd like to talk for a moment about the Robinson-Packman claims. And, you know, it's plain that under 13F, a buyer, like Allied, can be liable only when there's proof that he induced or received an illegal discrimination in price with knowledge that the price was illegal, the price or terms were illegal. So since buyer liability is derivative from seller liability, the plaintiff has to prove both of those elements. They have to prove that the prices were illegal. In other words, they're not within one of the available defenses. And most fundamentally to this case, they have to prove that the buyer knew that. The buyer knew that the prices were within one of the available defenses. And the fatal flaw, the fatal defect in Mr. Gorelick's claim here is in proving Allied's knowledge. There's no evidence that Allied had actual knowledge, had actual knowledge that the prices that Carsound was giving it were illegal. There's no evidence that Allied had knowledge about what Gorelick's pricing was. There's no evidence that Allied had knowledge about what any other distributor's pricing was. The undisputed evidence was that Carsound kept that secret. And as the district court found, even if Allied knew that Carsound was occasionally deviating from its pricing programs, its published pricing programs, Allied, there's no basis for Allied to know whether or not Carsound was deviating from those programs for everybody else too. So since they can't supply any evidence of actual knowledge, what they do here is they present a bunch of different bits and pieces, I believe, trying to show constructive knowledge or imputed knowledge. And, you know, the Supreme Court said in the Matsushita case that they need to do more than establish a metaphysical doubt here. They need to do more than that, and they failed to do that. And if you look at these little pieces of evidence, it's clear. Consider first the trailer load pricing issue. Gorelick says that we got trailer load pricing without buying full trailer loads. But the evidence, Allied, they have, there is no evidence that Allied knew that Gorelick did not get the same treatment. And the testimony is that, in fact, Gorelick did get the same treatment. They dispute that. But it doesn't really matter because the key point is there's no evidence that Allied knew that Gorelick was not getting the same treatment. And that's what they need to prove under 13F, and that's what's lacking here. Pallet pricing, same thing. We got pallet load pricing even though we weren't buying pallets full of the parts. There's no evidence that we didn't know whether Gorelick was getting the same pricing or was not getting the same prices, or whether any other distributor was getting the same deal or not. There are statements by Allied managers to their salesmen. Nobody can beat our prices in the field. Well, those don't suggest that Allied knows, in fact, what other people's prices are. They're just statements by managers to their sales staff trying to enthuse them to go out and sell hard and sell more products, which is an absolutely pro-competitive behavior. There's a document that they trumpet, it's a comparative sales document, and it shows for two different periods of time the total volumes sold by various of Carsound's distributors. There's nothing about what those volumes are comprised of. We don't know the parts they're comprised of. We don't know the prices they're comprised of. And there's no way that you can reverse engineer from knowing that, you know, distributor X sold $1 million worth of parts within a period of time what his prices are for any of these, this range of exhaust products. There's another document that has, it's labeled Confidential Carsound Price Levels. It's Carsound's pricing program. It has the different price, what the evidence is, that Carsound had a multi-tiered pricing program that it individually negotiated with each of the distributors where they'd be. That document doesn't tell us anything about what Gorlick was receiving or what anybody else was getting. So, on the issue, it's a required element of their case that they show that Allied knew it was getting illegal prices and there is nothing that shows that, and that's why the district court correctly dismissed this. They try to get to the trade experience or duty to inquire, to create constructive knowledge in that way. But under the Fred Meyer case, there needs to be a threshold showing of knowledge of illegality in order for those doctrines to apply at all, and that's absent here. This case has none of the factors that the Fred Meyer decision relied on. All of the evidence is that Carsound kept its pricing program entirely confidential and that my client, Allied, had no knowledge of what Gorlick was getting or what any other distributor was getting. And so, since they have to prove that knowledge, summary judgment was appropriate and should be affirmed. Thank you. You have about a minute and a half left, sir, Bob. Thank you, Your Honor. No, a minute and 15 seconds. Very briefly, just a couple of points. With respect to the Section 2F or 13F knowledge issue, we've detailed that in the brief, so I'm not going to try to reprise it here. The one thing I'd like to emphasize, though, is as this Court said, the ultimate goal of the 2F inquiry is to find out whether, to determine whether the buyer is not an unsuspecting recipient of prohibited discrimination. Is the buyer an unsuspecting recipient of prohibited discrimination? We think the evidence here is sufficient, at least on summary judgment, to show that Allied was not an unsuspecting recipient. For example, just to highlight one piece of evidence, there is evidence in the record that they were lobbying Carsound to up Gorlick's prices. There's no pro-competitive justification for that at all. That was a document that one of their managers wrote, now their CEO. What does that prove? If they are trying to up Gorlick's prices, they cannot, after the fact, say, oh, we were an unsuspecting recipient of prohibited price discriminations. They are generating the price discriminations themselves, which is one of the things that this Court, particularly in Fred Meyer, pointed to and said, if you are inducing the price discrimination, you can't, after the fact, say, oh, we were just an unsuspecting recipient. Does this have to do with shipping charges? I mean, they were trying to up the prices? No, this is not so much with respect to the shipping charges. This was a general comment. He did not tie it specifically to particular items. But as we've detailed in the brief, there were a number of other discounts and rebates that Allied received that Gorlick did not, the trailer load pricing, the pallet pricing, rebate quotas, and level 8 pricing versus level 7 pricing. Those were all instances where... And you would infer that they knew all about these discounts? From what? Well, there's a number of pieces of evidence. One is the fact that they were trying to get Carsound to up Gorlick's prices. There's also a subsequent email after the settlement in which they recognized that now, that's their term, there would be an even playing field. From which we infer that they knew beforehand, they wouldn't say now there would be an even playing field unless they recognized that before there had not been an even playing field. And as we detail in the brief, we believe actually there is strong evidence that you can reverse engineer these prices. Moreover, one of their own witnesses testified that one way he knew he was buying better than his competition was when a supplier like Carsound was giving him breaks on the discount programs contrary to the terms of the discount program. So for example, giving pallet pricing without buying pallets, they're giving the pricing discount without actually meeting the terms of the program. He said, I know that I'm buying better than my competition if I'm getting the pricing programs without actually meeting the established criteria. So this isn't speculative. These are the pieces of evidence to indicate that they knew. I'm sorry, how did it show that they knew that Gorlick wasn't also getting pallet pricing without buying a pallet? Yeah. Well, and that is where the district court said, the district court inferred, the district court said the buyer, allied, would assume that if they're getting that favorable treatment, then everybody else is getting the favorable treatment. Our view is that the inference, the reasonable inference, actually goes the other way. You would assume that the manufacturer was actually enforcing its pricing program the way that it stated its pricing program. At the very least, it's a reasonable inference. And so if you're going to be inferring from that evidence one way or the other, and we're on summary judgment here, we think it's a reasonable inference that, in fact, the buyer would assume that the pricing program was being enforced the way it was stated.  There's more in the brief, Your Honor. I see that I'm out of my time, so I'll conclude. Thank you. Okay, thank you. The case is highly reasonable, Your Honor.
judges: Kozinski, Beezer, Paez